The first case for argument is United States v. Damion Hallmon. Okay. Mr. Kushner. Good morning. May it please the Court. My name is Jordan Kushner, and I represent the appellant Damion Hallmon. I'm going to start with the issue about the search, the expanded stop and search of Mr. Hallmon and his vehicle that had violated his Fourth Amendment rights. Mr. Hallmon was stopped allegedly for having an illegal air freshener, which is something we challenged also, but I'm not going to focus on that in the argument because of the time constraints. But after he was stopped, the officer claimed that he seemed real nervous, had bloodshot, dilated, watery eyes, and therefore Counsel, let me back up just for a moment. How do we know that there was an air freshener hanging from the rearview mirror? I guess it's the officer's testimony and then the video. And was there any video evidence that showed this? I don't – I think the video showed something. You know, whether it was – I guess I wouldn't concede that it showed enough to establish that there was an air freshener, and I'm glad that the Court raised that point. But it's mostly based on the – I think all that the – everything that was relied on was the officer's testimony. Well, I guess the reason I asked the question, it was my understanding that the camera was not turned on until later. And that – you know, that's an issue. Yes, so whether he was able to observe it or not, that's a highly disputed – that is a highly disputed point in the – and so the issue is whether there was sufficient evidence to support the officer's claim that he saw an air freshener. And so, yes, we did litigate that issue, and I think that is something we're strongly maintaining because the camera wasn't turned on, and at least the views that we had after the camera was turned on don't indicate that he was any – in any position to have viewed Mr. Holman and looked him up at the same time and figured out all the information that he claimed. Is there an issue as to whether the – whatever's hanging in the rear view can actually obstruct? It seems like it's the obstructive aspect of it. Is there a – maybe this is not where you wanted to focus your argument, and I'll kind of move on. But is there a size, or is it just sort of a judgment call? I think that's obstructing view, or is it that you can just have nothing hanging? Yes. I have to – you know, I did not – it's been a while since I looked at the statute, to be honest with you. Fair enough. But I think I – yes. So going to the – going to the stop – well, to the expanded stop. So the officer claimed that Mr. – he thought – claimed that Mr. Holman was really nervous. He had dilated, bloodshot eyes. And, you know, the problem is we can see the video ourselves, and, you know, Mr. Holman is nervous, but there's no way to support a claim that he's extraordinarily nervous. And there isn't any evidence of marijuana use. He's – you know, the officer admits that he didn't smell any marijuana. And so the – an underlying problem with this whole situation is it really looks like racial profiling, and it goes to the issues that the – that the Department of Justice addressed, you know, with the Minneapolis Police Department and resulted in the consent decree and also the Minnesota State Human Rights Department, where this was one of the issues where they focused on, was that marijuana was often used as an excuse for the disproportionate stops and, you know, illegal interventions, you know, searches and arrests of African-American people. And so this is something that's happening, you know, right outside of Minneapolis, you know, basically. It's basically the same area. And there isn't any kind of concrete basis here for the police officer to really – to claim that he had probable cause to believe that there was marijuana in the vehicle or even reasonable suspicion. Mr. – I mean, the case law is showing that, yeah, people get nervous when they see police, and that's not enough. What about that little baggie? And I say that was a new baggie to me, but you get to see it in the video. What about that? Well, first, we're challenging what happened before he asked him to get out of the car, which is, you know, the baggie didn't appear until the officer ordered him out of the car. So your point, you believe it was extended at the point he asked him to get out, and so you don't think that someone can just – that the officer can ask him to get out just for routine questions? Well, I mean, I think based on the sequence of events, he wasn't asking to get out for routine questions. He'd already asked routine questions, and he was clearly trying to pursue this investigation to determine whether there was drugs in the vehicle. And so getting out of the vehicle wasn't – in this case, wasn't part of the routine stop. But, yeah, once he discovered the baggie, it's still not sufficient. The baggie was empty, so there wasn't probable cause to believe that there's marijuana in the vehicle. And so the questioning was – went way beyond what the scope of the reason for the stop was, which was the alleged air freshener, and then finding out that he had a suspended license. So, yeah, that was – so that's the problem here is that this was a – the whole sequence of events really was the over-aggressive investigation, frankly, indicative of the kind of racial profiling that happens with the Twin Cities – police in the Twin Cities area, and there wasn't anything concrete on the part of Mr. Holman to lead to the kind of suspicion that would justify an extended stop. He could have – you know, he should have given it a ticket, said, okay, get out of the car, you can't drive anymore. And so he was in a shopping center parking lot. They could have just parked the car, and he could have found someone else to drive it home, or his companion could have driven it home, and there wasn't the need to actually extend everything to the point where there was a search. So there wasn't a need to have him get out of his vehicle at that point, and even after he discovered the empty baggie, which it just had a marijuana symbol on it, there was no marijuana in it, it wasn't sufficient to move on to the search of the vehicle. And in looking at the case law that – you know, the past case law that finds basically any sign of marijuana could sometimes justify a complete search of a vehicle. So I think there needs to be a perspective at this point that marijuana isn't even illegal anymore in the areas that are in the state of Minnesota. So we're not even talking now about something that – the fact that there's presence of marijuana in some way even violates the law. Isn't it still a controlled substance under federal law? Yeah, it is, but it's not something that's ever prosecuted, and it's not something that – you know, I think it's illegal to smoke marijuana in a vehicle. But the – Well, if an air freshener can create probable cause, maybe marijuana can. Yeah. Well, the air freshener was what he had asserted as the basis for the stop, and then he looked up and found that there was a – that the driver had – the owner had a suspended license, didn't know that – didn't validly know that Mr. Holman was the owner. You know, again, that's something he claims that he looked him up on the computer, and I think those claims are really suspect. But, you know, air freshener is obviously common. This wasn't – there's some case law he cited that he distinguished where there was, like, a really heavy smell of some – of things that are used to mask the odor of marijuana. There was no allegation of that here. So whatever it was, it was just – you know, it was just something commonly that people have in the car. It wasn't an indication that it was used to mask marijuana, and that's not even an allegation that the officer made. I'd like you to address your Miranda custody issue if you might, and I don't know if you were going to turn to that next. Well, I'm happy to address whatever the court's interested in. Well, I'm interested in your best argument for what takes this out of sort of the ordinary traffic stop. It sort of seems to be a blending. I think independent of your arguments about the validity of the stop, it seems to be a traditional traffic stop. The district court sort of says, you know, that's what happens and you don't have to give Miranda. Then you find a gun. And I'm just interested in your best argument for when does this pivot out of that ordinary traffic stop that, you know, Berkemer tells us is just different. It's more like a Terry. When does it go beyond Terry? I think what sets this case apart is that the officer discovered evidence of a potential felony. So this is when he discovers that gun and then the girlfriend blames it on Mr. Holman. You know, at that point, he knows about Mr. Holman's criminal record. So at this point, you know, this is now a serious felony investigation. And so is that then the consequence of that is what you're saying is there's no way he was going to be able to leave? Is that sort of he is de facto in custody at that point? I think that's one reason is that, yeah, there was no way he was going to be able to leave once he found that gun and it was attributed to Mr. Holman. And then two, because it was a serious felony, we're at a stage now where the consequences are very high. So this isn't just some casual conversation where the police is just investigating and trying to understand the whole situation. But he is actually questioning Mr. Holman relating to a felony offense that he's likely facing. Because it's this combination, ordinary traffic stop plus moving into finding a gun, it seems like the factors don't really help us as much as they do in sort of a more separate, traditional custody question because we started with the traffic stop. And that's what I'm struggling with is how to apply the law that we have now to this somewhat, I don't know if it's an unusual situation, but it is challenging. Yeah. I mean, so he's not in a room in the police department where he's been handcuffed. But I think for the purposes of, you know, originally for Morand about being in custody and the whole idea about custody about being free to leave, he clearly wasn't free to leave. And it's beyond the cases where they're not free to leave just because they're being stopped. But at this point, he's the suspect in a felony investigation. So it's no longer the temporary and brief stop. Right. It's clearly not a temporary situation anymore. He's, yeah, because he's now suspected of being a felon in possession of firearms. So at that point, it's clear that he's not leaving, that there's no, that the officer knows that he's not going to be letting Mr. Holman leave. He's not just doing some kind of investigatory questioning, but it's clear that he's not going to be able to leave. And Mr. Holman is now in a more serious situation as well, given that he's suspected of a felony offense. So the freedom, you know, the freedom to, you know, the freedom is much less, there isn't any freedom here to the extent that might exist in a situation where there hasn't been evidence of a crime uncovered yet. So, yeah, I think that's significant. And then also the, you know, he was, the officer basically fools Mr. Holman into answering the questions by saying that, you know, pretending that it's not a big deal and he wants to let him go, when clearly that's not the case. Do you think we would have to, is there any case law that binds us in a way that prevents us from ruling in your favor? In other words, is this sort of a new or novel argument, or is it just an extension of the custody cases? I think the facts are sufficiently distinguishable so that the court could rule in our favor without contradicting the prior precedents. And I think it is important because I think the, you know, I think the case law, frankly, has gone too far on interrogations in terms of making it, you know, of obviating the underlying Miranda, purposes of Miranda. And I was going to talk about the phone conversations, but I'm going to leave the rest of my time for rebuttal. Thank you very much. Thank you for the argument. Ms. Reversa. Thank you, Your Honor. May it please the Court. My name is Mary Reverso. I represent the United States and was also one of the prosecuting attorneys in the trial below. Mr. Holman raises seven issues on appeal. I'll focus on the ones that have been addressed thus far, and then, of course, happy to answer any questions about any of the other issues as well. With respect to the obstruction in Mr. Holman's rear view mirror that served as a basis to initiate this stop, the district court reviewed de novo the record and found that the obstruction hung low enough that it would have been visible to the officer from the adjacent lane, as the officer testified. And was that based on video evidence or witness credibility of the officer? Both. The witness testified at a motions hearing that lasted two hours, 15 minutes, was subject to extensive cross-examination, was confronted with his body-worn camera, and asked about it. When was the camera turned on? The camera turned on when the officer was behind Mr. Holman in the lane of traffic. It was after he had already considered initiating the traffic stop and moved later. So why was the camera not turned on sooner? The camera initiated when the officer activated his emergency lights, and then there's a 30-second buffer period, so it captures 30 seconds before that. But the officer did not manually initiate it before that. As the officer was considering a traffic stop, there was no need or requirement for him to start it just when he's thinking about doing something, but it automatically starts when his lights are activated. So the video showed the air freshener was obstructing the view? When the officer approaches the vehicle once the stop has been initiated, the obstruction, the air freshener is clearly visible in the vehicle. And again, in the district court's review, Addendum 29A, she found that it would have been visible, given kind of how it appeared to an officer in kind of the series of events that the officer described. Is there any evidence about whether the State of Minnesota routinely stops people for having air fresheners in there? I'm unaware, Your Honor, but it's important to note that was just one of the bases for the stop here. The obstruction was one reason, and then the fact that Mr. Holman was driving with a suspended license was another reason that the officer initiated the stop. Mr. Holman was the registered owner of the vehicle. When the officer ran Mr. Holman's license plates, he observed the DVS, the Driver Vehicle Services photo of Mr. Holman, could see Mr. Holman again from an adjacent lane and believed it to be the owner of the vehicle who was also driving the vehicle. And again, the district court reviewed that photo, didn't see there to be enough difference to stop the officer from believing that was the same person. And so the officer also believed that Mr. Holman was driving with a suspended license. With respect then to the kind of how the stop progressed, the officer initial inquiries were related to the bases of the stop. There was routine questioning and then follow-ups on information learned from the occupants, like where the occupants were going. The officer articulated both those bases for the stop right at the outset. Mr. Holman admitted he had been cited for driving with a suspended license the day before. And again, the obstruction, the air freshener is visible from the officer's body-worn camera. The officer observed what the district court described as more than ordinary nervousness from how— What about the exit point? Would you talk about the very exit? Did he need to leave the vehicle for all this? The officer went back to his squad car, ran some routine checks, and then came back and asked Mr. Holman to exit the vehicle, which he's allowed to do just an ordinary course. The district court, again, found even without kind of the nervousness and suspicion, the officer would have been able to ask Mr. Holman to exit the car. And it was as soon as Mr. Holman exited the car that the officer found or saw in plain view that blue baggie. Again, it had a warning label, a cannabis flower depicted on it. It noted cannabis flower. The officer was familiar with such baggies and so immediately noticed it, saw it, opened it, smelled it, noted that it smelled like marijuana, proceeded to ask the defendant about if there was any marijuana in the vehicle. The defendant first said there was not, but subsequently, and this was about eight minutes, nine minutes into the stop, the occupant, Mr. Holman, admitted there was some amount of marijuana in the vehicle. He referred to it as some leftover roaches in the ashtray. So at that point, the officer had probable cause, under the automobile exception, to search the vehicle, including containers within it, such as the passenger's purse, to look for narcotics. From there, I'll talk about the statement, unless Your Honors have any other questions about the stop to that point. Once the firearm was recovered, the officer continued to search the vehicle. Again, it was a family van. It was full of, there were two very young children also present. There were a lot of the family's belongings in the vehicle. It took some amount of time to search the vehicle thoroughly. There were roaches or marijuana found in the ashtray in the vehicle. But ultimately, the officer then approached the passenger, asked her about the firearm that was found in her purse. She had admitted that it was Mr. Holman's. So then the officer approached Mr. Holman, asked to speak to him separately. So at that point, why should we conclude that Mr. Holman was not in custody after Officer LeBaron found the gun and started asking him questions about it? The ultimate inquiry, as the Court knows, is whether there was restraint on freedom of movement of the degree associated with the formal arrest. And as the District Court found, that ultimate inquiry was just not met at that point. Was he free to leave? He was detained pursuant to the traffic stop. And so that's, I agree, it's a little challenging to apply because he was not free to leave. He was detained throughout the course of the traffic stop as the officer investigated the bases for the traffic stop. The Supreme Court, as you know, is always careful to put the word temporarily detained. You probably know this from Berkemeyer and the other cases. Correct. Temporarily detained. Yes. And, of course, sometimes the temporarily is for a long, long time in these traffic stops. So how do we know where to draw the line on when it's temporarily and when it's permanently? This was still temporarily detained for a number of reasons. His restraint of movement at that time was not out of ordinary for a traffic stop. He wasn't subject to any strong-arm tactics of any kind. The hallmark examples of formal custody were not existent at this point. As Mr. Kushner noted, he wasn't at the police station. He wasn't handcuffed. He also wasn't put in the back of the squad car. Going back to Judge Benton's question, why wouldn't the logical delineation be between temporary detention for a traffic stop and further detention? Why wouldn't that be when the mission of the traffic stop was completed? And once he started investigating the firearm, why wouldn't that be something other than a traffic stop? I think at that point, he had found the firearm. He was investigating the firearm. But he was unsure at this point still of who was responsible for the firearm. It was each adult occupant was perhaps temporarily still detained in connection with the traffic stop, but the officer had not quite figured out whose gun it was, who might be permanently detained. He had started with the passenger to ask about the firearm. He then moved to Mr. Holman to ask about the firearm. And I believe the second question to Mr. Holman was, but wait, this was found in the passenger's purse with cards in her name, with her belongings. So he was trying to figure out kind of what to do with respect to this firearm. At what point does the officer know he's a felon? The officer testified that he hadn't put together the fact that Mr. Holman was a felon. He had searched his criminal history, so he was aware when he went back to his vehicle that Mr. Holman had prior felony convictions, but that part just hadn't clicked. Again, just kind of going through the – Is that even before he gets out of the car? That is before he gets out of the car. Even before he exits the vehicle? Yes. You think a reasonable police officer would have known he was a felon? I think he knew. He just, like I said, hadn't put it together. But yes, I think for intent – Did the district court make findings on that point? At what point he knew he was a felon? I believe – I'm not sure if the district court explicitly found that, but the district court did acknowledge that the officer went back to search criminal history before asking Mr. Holman. Was the passenger a felon? The passenger was not a felon. And so the hallmarks of formal arrest are just not existent at this point. Like I said, there are several moving parts with the young children on the scene, the two adults, the location of where the firearm was recovered, that the officer had not placed either occupant under arrest in kind of prolonged custody at that point. The passenger said it was his at that point, right? Yes. Okay. Proceed. Yes. And, again, I believe it was the second question of Mr. Holman was, but wait, this was found in her belongings, in her purse with cards in her name and the like. But, again, all of the totality of the circumstances indicate that he was not in formal custody at this point. The questioning was brief. It took about one minute. It was in a public parking lot. The atmosphere was not police-dominated. There were only the two officers. There was no deception. There were two officers? Two officers, yes. Were backup on the way? Pardon? Were backup officers or other people on the way, other police officers on the way? No. It was just the two of them. At all relevant times during this? Yes. I was assuming that. Yes. I think it was about the time that Officer LeBaron asked Mr. Holman to exit the vehicle that the second officer arrived, and then it was just the two of them for the remainder of the stop. Throughout the course of the stop, the total length of the stop, from the initiation of it to the time when Mr. Holman was placed under arrest, was about 30 minutes. Throughout that time, Mr. Holman was periodically returned to the other passengers. He wasn't isolated from them throughout that entire time. He was told, though, not to go, excuse me, to speak to the passenger, right? There was some direction by the officer as to where Mr. Holman could go? There was some direction about where Mr. Holman could go. Again, there were two young children here, and so the officers, the two officers, tried to coordinate with respect to, I'm going to speak to one of the adults over here, the other adult, please stay with the kids, and that second officer just kind of makes sure no one runs off kind of thing. So there was some direction of movement with respect to, please come talk to me over here. Okay, can I please speak to the other of you over here? Again, kind of going between the two adults who were present on the scene. So again, the totality of the circumstances show that he was not in custody during the course of this questioning, given all of the facts about how the questioning took place, where the questioning took place, and the like. I think with that I will just talk briefly about the fact that the admission of the statement, if error, which the government argues it was not, would have been harmless beyond a reasonable doubt because of the overwhelming independent evidence against Mr. Holman. But it was in her purse. She didn't testify, right? So the admission was a pretty strong piece of evidence for you at trial, and it was argued pretty strongly. So do you really think it's harmless? It was not the only confession by Mr. Holman. So yes, it was argued, but there was a second confession by Mr. Holman, as well as very strong DNA evidence with respect to Mr. Holman and some consciousness of guilt evidence as well. So yes, Your Honor. The second confession was from the day after he was arrested. He made a phone call to his boss where he told his boss he was on hold for PC felon in possession. His boss clarified for what, and Mr. Holman said felon in possession. And his boss asked, you had something on you? And Mr. Holman responded, my burner, man. He called the burner mine, admitting the loaded gun was his. And that context of the conversation, again, immediately after he acknowledged the hold was for felon in possession, that burner can only mean a firearm. There was also, like I said, overwhelming DNA evidence. The major mail profile matched Mr. Holman. Was there DNA evidence from the passenger? There was. Yep. The match would not be expected to occur more than once among unrelated individuals in the entire world's population, the strongest possible statistic. The DNA expert testified, other than Mr. Holman himself, the only other person in the world whose DNA profile could have been recovered from the grip would have been an identical twin. This kind of DNA result is typically from direct contact with an object rather than transference. It's just too strong not to be anything else. You claim that Holman's testimony supports it, too, but I don't remember your argument. A sentence or two, can you tell me how you think his testimony supports harmlessness? The consciousness of guilt aspect on it? Did he testify at trial? He did testify at trial. Yes, I thought. Okay. Now, what in his real testimony do you rely on when you refer to that? Or maybe I misunderstood your argument. Yeah, I'm not sure. I misunderstood your argument. Okay. Yeah. There was consciousness of guilt at the scene where he quickly told the passenger, grab your purse, when the officer tells him he's going to search the car. So just kind of that acknowledgment of quick, grab your purse, baby. I see my time is up. Yes. Thank you for the argument. Mr. Cusher. Let me just start off with the harmless error. This was the confession at the scene was a huge piece of evidence. It was the only direct evidence of Mr. Holman's guilt. Everything else, you know, is highly, highly disputed.  Well, the DNA, we called an expert to explain how the DNA can be transferred, and so that issue was, you know, very heavily disputed. And even their expert who testified agreed that there's no way to determine how the DNA got on there. There wasn't any evidence to show that there was something about this DNA, any evidence that showed that it was directly on the gun. And then we went over heavily in the vehicle about how the officer handled all these different items from the companion, Ms. McGrone, before he touched the gun. And then, of course, the DNA could have been transferred before, with Ms. McGrone having contact with Mr. Holman and then touching the gun. So I think the DNA transfer explanation was very heavily litigated, and it's very clear that just because someone's DNA is on an object doesn't mean that they touched it. And there was no evidence of probability about whether Mr. Holman touched it or whether it was transferred. So that's an issue that the jury could have easily and should have determined wouldn't be sufficient to prove it beyond a reasonable doubt. So this is not a case where the DNA evidence would have sealed Mr. Holman's fate. He had plenty of contact with the person who actually had the gun and plenty of opportunity for transfer. And the police themselves, the way they did the search, proposed plenty of opportunity for transfer of the DNA. And Mr. Holman didn't confess. He had a conversation with his employer while he was in jail, and the employer specifically took the stand to testify as to the meaning of the conversation. He said that Mr. Holman said they took my burner. He explained he understood that to be a cell phone. Mr. Holman explained that he was talking about his cell phone when he testified. And the agent herself who did the recordings agreed that burner can mean cell phone. So the, so yeah, the confession is the, it's a huge critical part of the government's case. I don't think they could get a conviction without the confession. I think the, in terms of Mr. Holman's being in custody, and he was, it's on the video, body cam videos. He did try to, at some point, try to speak with Ms. McGrone while they were both being held separately in different places by the police and was told by the, he was restrained by the police, you know, basically prevented from being able to talk to her. So it clearly was a police-dominated atmosphere, and it wasn't, it definitely wasn't temporary at the point that they found the gun. And obviously knew he was a felon. Thank you very much. Thank you. Thank you both for the argument. Thank you, Mr. Kushner, for your service under the Criminal Justice Act. And case number 24-1837 is submitted for decision by the Court. Ms. Laska.